STATE OF WEST VIRGINIA *v.* JOE COREY

(No. 7715)

Submitted September 21, 1933.   Decided October 3, 1933.

*Salisbury & Lopinsky* and *W. W. Wertz,* for plaintiff in error.

*Homer A. Holt,* Attorney General, *Kenneth E. Hines,* Assistant Attorney General, and *A. M. Belcher,* for the State.

MAXWELL, PRESIDENT:

To an order of the circuit court of Kanawha County affirming the judgment of the intermediate court of said

county imposing sentence of death on Joe Corey upon conviction of first degree murder of Katherine Ghiz, the defendant prosecutes this writ of error.

At about eight-thirty o'clock in the evening of July 11, 1932, in the store of Saleem Haddad at the corner of Delaware and Virginia Streets in the city of Charleston, the defendant shot to death both his wife, Ada Corey, and Katherine Ghiz.

The women came to Charleston about six o'clock the evening of the tragedy and went to a private home on the opposite side of the street from the Haddad store. Mrs. Corey and the defendant had not been living together as husband and wife for some months. She lived in Huntington, he in Charleston. Mrs. Ghiz lived in the city of Logan.

The defendant went to the Haddad store soon after eight o'clock in the evening. Only Mrs. Haddad and her young niece were there. Presently, Mrs. Haddad answered a call on the telephone which was located just behind a partition across the back part of the store, the partition not extending to the ceiling of the room. Mrs. Haddad is a Syrian woman and sometimes has difficulty understanding our language. Not being able to comprehend what was said to her over the telephone, she asked Corey to take the receiver. He did so and told her the call was for Katherine Ghiz, and that she was at the priest's house across the street. Mrs. Haddad immediately sent her niece for Mrs. Ghiz, who, with Mrs. Corey, came at once to the store with the girl. The defendant remained in the rear of the room and as Mrs. Haddad led the way for the women back through the store to show them the location of the telephone, he indicated to her by gesture that she should not disclose that he was there. Mrs. Ghiz approached the telephone. Corey emptied six chambers of a revolver at her. As she begged for mercy he said, according to Mrs. Haddad: "You tell me please? I will kill you first. I will let you die first." Four balls penetrated her body. She fell dead. Casting aside the revolver he had used, he drew from his pocket another one which he directed at his wife. Four bullets were fired at her and two cartridges failed to explode. To her he said: "You want a divorce? Here's your divorce." After she fell he used the second revolver as a bludgeon with which he beat her face as she lay prostrate

on the floor. An officer rushed in from the street and arrested Corey before he had ceased beating his wife. She died of her wounds.

Comment on the horror of this affair would be superfluous.

There was no denial of the homicides. The defenses were (1) that the defendant was insane at the time of the tragedy, and (2) "that prior to and at the time of the commission of the offense, he was intoxicated to such an extent that he was incapable of entertaining the elements of murder in the first degree: wilfullness, deliberation and premeditation, and did not become so intoxicated for the purpose or with intent of committing the acts complained of."

As to insanity, there was a sharp conflict of testimony. For the defense, both lay and medical witnesses testified that in their opinion Corey was insane when he killed the women. But several physicians and numerous lay witnesses called in rebuttal by the state testified that in their opinion the defendant was sane. This conflict presented a question for jury determination. In our opinion the evidence justified the belief that the defendant was sane when the homicides were committed.

As to intoxication, there is no testimony on behalf of the defendant that he was in fact intoxicated at the time he committed the crime, though evidence in his behalf tends to show that he had been drinking intoxicating liquor that day. Several witnesses called by the state testified that immediately after the homicide they observed no indication that Corey was intoxicated. Mrs. Joe Solomon testified that the defendant talked with her at her home on Virginia Street about one-half hour before the tragedy and that he was all right then, and that though he was close enough to her for her to have smelled fumes of liquor if he had been drinking, she did not detect any odor of intoxicants. The issue of drunkenness was likewise for jury determination, and, in our opinion, the jury was warranted under the evidence in resolving that question also against the defendant.

Numerous errors were assigned. We shall discuss those of which consideration seems necessary.

Over objection of defendant, a witness, J. W. Perry, an attorney of the city of Huntington, was permitted to testify

that two or three months prior to the double homicide, the defendant told the witness at his office in Huntington that he (Corey) was going to kill his wife. The basis of the objection is that on a trial of the defendant for the murder of Katherine Ghiz it was irrelevant, improper, and prejudicial to admit evidence of a threat by the defendant against the life of his wife. The defendant consummated his threat, and more. The double tragedy was one affair. While ordinarily threats made by an accused against one person are not admissible on the trial of an indictment for the murder of another, that rule cannot in reason be applied where there is direct connection between the threat and the crime committed.

Numerous cases disclose that on the trial of an accused for a crime against a particular person, it is proper to admit evidence of the accused's threats against another, provided, of course, there is connection between the threat and the crime. *State* v. *Fox*, (Idaho) 16 Pac. (2d) 663; *People* v. *Craig*, (Cal.) 44 Pac. 186; *Rawlins* v. *State*, (Ga.) 52 S. E. 1.

In *People* v. *Wilt*, (Cal.) 160 Pac. 561, which involved the trial of accused under an indictment for murder, the court held: ''Where accused assaulted decedent and a third person, and the third person was wounded by a shot fired by accused at the time decedent was shot by accused, evidence of previous threats made by accused against the third person was admissible under the rule that while threats against decedent are admissible to show malice, threats against another person are only admitted under circumstances showing some connection with the injury inflicted on decedent.'' *A fortiori* is this true where the accused kills not only the person threatened but another at the same time.

In our judgment, the trial court committed no error in permitting the witness Perry to testify of the threat made by Corey against his wife. It follows that the incorporating of this threat in several hypothetical questions propounded to different witnesses by the state on the question of the mental condition of the accused at the time of the homicides was not error.

In a hypothetical question propounded by the state to a defense witness, Dr. Philip Jaisohn, among other things, it was recited ''that on the day of the shooting he (defendant)

inquired on two different occasions of the chauffeur who had brought Mrs. Ghiz and Mrs. Corey from Logan to Charleston, where they were and if they were not in Charleston.'' This is alleged to be prejudicial error because it appears from the testimony of the chauffeur that Corey's two inquiries related only to the whereabouts of his wife. We are impressed that this inaccuracy in the said recital in the hypothetical question was not prejudicial to the defendant in the light of the testimony that shortly before the hour of the tragedy the defendant endeavored to ascertain the whereabouts of Katherine Ghiz. Mrs. Joe Solomon, above mentioned, said that when the defendant came to her home about a half hour before the shooting, he requested her to call two different places and make inquiry if ''Katy'' Ghiz was there. That he was looking for Mrs. Ghiz as well as his wife there seems no doubt.

Several hypothetical questions propounded by the state to physicians contain the assumption that prior to the tragedy there was trouble between Corey and his wife. It is urged that the record does not justify this assumption. We think it does. A defense witness, Mrs. Lee Ray Smith, testified that in the months of April and May preceding the tragic events which gave rise to this case, she saw the defendant frequently at the home of his sister, Mrs. Aide, on Washington Street, in the city of Charleston. The witness said: ''He (defendant) was very, very nervous, very upset. Very upset over his trouble with his wife.'' The fact that there had been trouble between the defendant and his wife is accentuated by his above quoted statement to her when in the act of killing her: ''You want a divorce? Here's your divorce.''

On direct examination by the state of Dr. A. A. Wilson, a neurologist, it was stated to the witness that Dr. Jaisohn, a witness called by the defendant, had testified that at the time he examined the defendant in November, 1932, he was not suffering from paresis. In the same question, on the said basis of fact, expression of opinion was elicited of the witness. This is asserted to be prejudicial error because, it is said, Dr. Jaisohn had not testified as stated in the preamble of the question propounded to Dr. Wilson. On direct examination, Dr. Jaisohn testified that in his opinion portions of the

defendant's brain were diseased. On cross-examination, he was asked if at the time he examined the defendant he had paresis. He answered: "No. The beginning stage." Though Dr. Jaisohn had testified in chief that in his opinion the defendant showed a luetic curve inclining to paresis and that in his opinion the defendant was starting into paresis, we think the state did not misquote him in the said statement made in the above quoted question to Dr. Wilson.

George Dudley, a deputy sheriff of Kanawha County, introduced by the state, testified that as such officer he had on several occasions taken the defendant from the jail to the court room and returned, and that in his opinion the defendant was sane. Permitting the deputy thus to testify is assigned as error prejudicial to the defendant because it appears on cross-examination of the deputy that on a previous night, in the progress of the Corey trial, the witness had been an officer in charge of the jury, and that on occasions he had escorted the jury to and from its quarters. While, under the circumstances, the introduction of the deputy as a witness is not to be commended, there is nothing in the record to indicate that there was any prejudice to the defendant by reason thereof. In *State* v. *Shores,* 31 W. Va. 491, 7 S. E. 413, this Court held that the fact that the sheriff had the trial jury in custody did not disqualify him from being a witness in the case on trial. Though it appears from the opinion in that case that no exception was taken to his testifying at the time, that fact does not distinguish the case on principle from the case at bar where exceptions were taken at the time of the examination of the deputy sheriff. The controlling element is prejudice, and if none is shown it will not be presumed. Rather the contrary, for the deputy must be presumed to have testified truthfully according to his knowledge and belief, and to have discharged faithfully the duties of his office when he had the jury in charge.

Certain remarks of the prosecuting attorney in oral argument to the jury are assigned as error. From the bill of exceptions embodying the challenged remarks, we quote: "Mercy, in my opinion, is not justified in this case. Would it not be better, gentlemen of the jury, that society be rid of people with murderous intent, as this man had? Would

anything be gained by putting him behind the cold and dark walls of a prison for thirty or forty years? Would it, do you think, be an example to other people who might be thinking of murdering some of those toward whom they have ill feeling to know the juries in Kanawha County are opposed to such actions to the extent that an eye should be given for an eye when those similarly inclined find out that the supreme punishment is going to be held out, as it is done so frequently in England? Then, in my judgment, such cold-blooded, wilful and deliberate murders as this might cease.''

Expressions of opinion by counsel on questions of fact involved in cases on trial are not proper. But we are not familiar with any principle which would require the setting aside of a conviction of high crime because at the trial, in the heat of argument, counsel for the state injected two or three expressions of opinion. It is only where remarks of counsel are unwarranted and prejudicial that a conviction will be set aside on account thereof. *State* v. *Scurlock*, 99 W. Va. 629, 130 S. E. 263; *State* v. *Wolfe*, 99 W. Va. 694, 129 S. E. 748.

A defense witness, Mrs. Hallie Jones, testified on direct examination that the last three days before the shooting she thought the defendant's condition was worse than it had been previously, and that ''he just acted like his mind was just clear gone.'' The trial court struck this out on objection and motion of the state. This is assigned as prejudicial error. While this answer might very properly have remained in the records for consideration by the jury, we do not think that its elimination prejudiced the defendant because this witness testified at length about the matters and circumstances within her knowledge pertaining to the defendant's mental condition. The jury was as well qualified to form an opinion therefrom as was the witness. She was, however, permitted by the court to express her opinion that the defendant did not know right from wrong.

Eleven instructions offered by the defendant were given by the court to the jury. Nos. 1, 2, 4, 6 and 8 were refused. This is assigned as error. No. 1 would have told the jury to find the defendant not guilty. No. 2 would have told them

that under the evidence they could not find the defendant guilty of murder in the first degree. Both were properly refused. Nos. 4 and 8 refer to intoxication; and No. 6 to insanity. These were properly refused because covered in substance by other instructions which were given. Five instructions offered by the state were given to the jury. Nos. 2, 3, 4 and 5 are challenged.

No. 2 reads:

> "The Court instructs the jury that any wilful, deliberate and premeditated killing is murder of the first degree; that one who does an act wilfully, does it on purpose; and he who does it on purpose, does it wilfully.

> "You are further instructed that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant Joe Corey, wilfully, de liberately and premeditatedly shot and killed Mrs. Katherine Ghiz, you should find him guilty of murder in the first degree."

The generalization in the first part of the instruction is of secondary importance. The vital part of the instruction is in the second portion where the act charged against the defendant in the indictment is dealt with specifically. The words there used, "wilfully, deliberately and premeditatedly" negative the idea of mental incapacity on the part of the defendant at the time of the alleged offense. If the generalization in the first part of the instruction is not technically correct as contended by the defendant, the incorrectness becomes of minor consequence in the light of the very specific terminology of the second part of the instruction.

We can find no fault with state's instructions Nos. 3 and 4. They are as follows:

> No. 3. "The court instructs the jury that if you believe from the evidence in this case, beyond a reasonable doubt, that Joe Corey wilfully, maliciously, deliberately and premeditatedly killed the deceased, Mrs. Katherine Ghiz, you should find him guilty of murder in the first degree, although he may have been drinking intoxicating liquors before and at the time of the killing, unless you further believe from the

evidence that at the time of the killing he was so insane or so grossly intoxicated, that he did not know he was doing wrong nor did he know what the consequences of his act might be.''

No. 4. ''The court instructs the jury that although you may believe from the evidence that Joe Corey was laboring under partial insanity at the time Mrs. Katherine Ghiz, was killed, if he still understood the nature and character of his act and its consequences, and had knowledge that it was wrong and criminal to shoot her, if you believe beyond a reasonable doubt that he did shoot her and that she died as a result thereof and if he was capable of knowing at the time that if he did shoot her he would do wrong and receive punishment, then any such partial insanity that he may have been laboring under at the time is not sufficient to exempt him from responsibility to the law for his crime of killing her.''

State's instruction No. 5 follows:

''The court instructs the jury that a person who has formed a wilful deliberate and premeditated design to kill another, and in pursuance of such design voluntarily makes himself drunk for the purpose of nerving himself for the accomplishment of the design, and then meets the subject of his malice when he is so drunk as not then to be able to deliberate on and premeditate the murder and kills the person it is murder in the first degree and if you believe from the evidence in this case beyond a reasonable doubt that the defendant, Joe Corey, prior to the killing mentioned in the evidence wilfully, deliberately and premeditatedly, decided to kill Mrs. Catherine Ghiz or his wife and in pursuance of such decision he did kill the said Catherine Ghiz, it makes no difference whether or not he was drunk at the time of the killing, if you further believe from the evidence that at such time he was not insane.''

In support of the challenge of this instruction, it is said that it embraces similar defects to that which appeared in state's instruction No. 2 in *State* v. *Robinson*, 20 W. Va. 713, 730, 742. That instruction was condemned because it did not ''connect the purpose to kill with the killing.'' The instruc-

tion at bar is different. It is based on belief by the jury that the defendant, "prior to the killing mentioned in the evidence, wilfully, deliberately and premeditatedly, decided to kill Mrs. Catherine Ghiz or his wife, *and in pursuance of such decision he did kill the said Mrs. Catherine Ghiz * * *.*" Another challenge of the instruction is that it is based on an intent, in the alternative, to kill Mrs. Ghiz or his wife. It is insisted that the defendant could not properly be convicted of first degree murder for killing Mrs. Ghiz because of a premeditated design to kill Mrs. Corey. Perhaps so. But he killed both of them. He was looking for both. He desired to kill both. Otherwise, why arm himself with two revolvers, and why say to Mrs. Ghiz when he shot her, "I will kill you *first*"? There can be no other conclusion from the evidence than that he planned to kill both of them. In the light of these circumstances, it would require an extreme refinement of reasoning to reach a judicial determination that the defendant was prejudiced because the jury was told that it could convict the defendant of first degree murder of Mrs. Ghiz if they believed from the evidence beyond all reasonable doubt that he killed her in pursuance of premeditated intention to kill her or Mrs. Corey. Granted that, as a general rule, an expressed intent of an accused to kill a certain person is not pertinent on his trial for killing another, but it may become pertinent and admissible under circumstances showing connection between the threat and subsequent conduct of accused, and where both persons are killed at the same time in pursuance of an evinced intent to kill both, reference in an instruction to a decision by the accused to kill one or the other must be deemed tantamount to a reference to a decision to kill both.

Again, it is urged that this instruction is not correct in its reference to voluntary drunkenness, because it is said that Corey began drinking on the day of the tragedy several hours before the arrival of Mrs. Ghiz and Mrs. Corey in Charleston and at a time when there is no evidence tending to show that he knew they were coming. True, direct evidence does not disclose such knowledge on his part, but some of the circumstances clearly indicate that he at least suspected or antici-

pated that they were coming to Charleston. At about the middle of the afternoon of that day he bought the revolver which he used that evening to kill his wife.· The pawn broker of whom the purchase was made testified that the defendant was sane when he made the purchase. Police officer Sturgeon testified that at police headquarters that evening, the defendant said: ''I got it (revolver purchased that afternoon) to do just what I done and if my wife dies I will be happy.''

It would be very unusual for a trial of the duration of this one to be carried through without error. Perfect trials are rare, if they ever occur. Upholding convictions does not depend upon the perfection of jury trials. It is not the province of courts of review to dissect records of trials for the purpose of determining whether there was any departure from technically correct procedure. An appellate court does not reverse for error in a trial unless it is reasonably evident that a party to the trial was prejudiced by reason of such error. Upon review of a state case, the appellate court's problem is to determine whether the convicted person has probably been prejudicially affected by error in the trial. If there seems to have been no prejudice, the conviction must stand. Where, in a criminal case, under the whole evidence, the jury could not properly have returned any other verdict than that which it did return convicting the accused, errors not plainly prejudicial will be deemed inconsequential. *State* v. *Rush,* 108 W. Va. 254, 150 S. E. 740; *State* v. *Dephenbaugh,* 106 W. Va. 289, 145 S. E. 634. In our opinion, in the case at bar, a verdict carrying a less penalty under our law would not have met the ends of justice and could not properly have been returned by the jury.

A painstaking examination of the record and consideration of the points of error raised by the able counsel for the defendant convince us that any errors that may have crept into the trial were inconsequential, that the defendant was regularly and fairly tried, and that there is no judicial reason why the judgment of the trial court should be disturbed.

Therefore, we affirm the judgments of the circuit court and the trial court.

*Affirmed.*